UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JULIAN CAMPOS and ROBERTO BARAHONA, | § § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| HMK MORTGAGE, LLC, | § | |
| | § | |
| Defendant. | § | JURY REQUESTED |

## COMPLAINT

Plaintiffs Julian Campos and Roberto Barahona bring this claim against Defendant HMK Mortgage, LLC ("HMK") and respectfully show Defendant violated their right to be free from discrimination in housing and consumer protections for homebuyers by failing to provide required disclosures and taking advantage of their membership in protected classes to induce them to sign illegal, unfavorable loans that deny them true homeownership.

## STATEMENT OF CLAIM

1.     Julian Campos and Roberto Barahona, minority homeowners of Hispanic origin in Dallas, Texas, bring this action for declaratory and injunctive relief, statutory penalties, damages, and attorneys' fees and costs against Defendant for numerous material violations of the Truth in Lending Act, 15 U.S.C. §§ 1601 *et. seq.* ("TILA"); for engaging in predatory lending practices prohibited by the Equal Credit Opportunity Act, 15 U.S.C.A. §1691, *et. seq.* ("ECOA"); and for discrimination on the basis of their membership in a protected class in the context of residential real estate-related transactions in violation of the Fair Housing Act, 42 U.S.C. §3605, *et. seq.* ("FHA") and the Texas Fair Housing Act, Tex. Prop. Code Ann. § 301.021 ("Texas FHA").

## PARTIES

2.      Julian Campos has lived in West Dallas for 35 years and is of Hispanic descent. Spanish is his first and primary language and his ability to understand English is very limited; he does not read or write any language. Mr. Campos also has very little education and limited economic means, relying principally on a fixed social security income to support himself.

3.      Roberto Barahona has lived in West Dallas for 25 years. Mr. Barahona is also of Hispanic descent. Like Mr. Campos, Mr. Barahona's first and primary language is Spanish and his ability to speak, read, and write English is very limited. Mr. Barahona works long days doing construction work, bringing home a modest salary to support his wife and two children who live with him in his two-bedroom home.

4.      Defendant HMK is a mortgage lender in the Dallas area. HMK is a "creditor" under the TILA and the ECOA, and a business engaging in "residential real-estate transactions" under the FHA. Its registered agent for service is Khraish Khraish and it can be served process at 1119 Singleton Blvd., Dallas, Texas 75212.

## JURISDICTION AND VENUE

5.      Pursuant to 28 U.S.C. §§1331 and 2201, this Court has jurisdiction over these claims. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because the events or omissions complained of occurred in Dallas, where HMK is located. Plaintiffs further invoke the Court's supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a), to consider their state law claims.

FACTUAL ALLEGATIONS

6.      Mr. Campos has long been a well-known neighbor in West Dallas. One reason he is well-liked is that he often lends a hand to whomever may need it. Another is that people see him taking a walk every day. From his home to the grocery store, the local senior center to neighbors' houses, Mr. Campos enjoys traversing West Dallas on foot so much that he has earned the nickname, "the walker," or "el caminante," in his native Spanish.

7.      Born to a family of modest means in Mexico, Mr. Campos is a U.S. citizen who has come a long way to become the friendly West Dallas fixture he is today. He had to forego a basic education and go to work at a young age to help to support his family. There was just one more thing he wanted to do to achieve the American dream: own his own house.

8.      For nearly fifteen years, Mr. Campos rented a house from HMK. To Mr. Campos, it is more than just a house, but also a home where he has made countless memories over the years. While he rented the house, he tried to keep it in good shape and wanted it to be well-maintained. But over the years, it has increasingly shown its age and needed repairs. As a renter, HMK would require Mr. Campos to go in person to HMK's office to put in a request for repairs, and even after he did, HMK would seldom respond in a prompt fashion. Today, the Dallas Central Appraisal District's website indicates that the desirability of Mr. Campos's two bedroom, 680 square foot house remains "poor".

9.      Originally from El Salvador, Mr. Barahona is a hard-working and family-oriented man. He works long hours doing construction, leaving very early in the morning and often not returning until after dinnertime. When he is not working, he and his wife help provide childcare for their 15-month old grandson. All of his children were born and raised in West Dallas, and now he is excited to watch his grandchildren grow up there as well. To him,

his family is the most important thing in his life. Being a homeowner for Mr. Barahona means providing for his family in the most meaningful way; a roof over their heads and the kind of comfort and stability that only a home can provide.

10.     Mr. Barahona rented his home from HMK and HMK's predecessors for 25 years combined and, like Mr. Campos, Mr. Barahona consistently paid his rent on time. The house HMK rented to him had also long been in a state of disrepair and in need of a lot of work. The wood was rotting, sheet rock was falling off, and there were chronic water and roof leaks, as well as electrical issues. HMK often met requests for repair with very delayed responses, and at least one time when the Defendant tried to cut corners by attempting to fix the problem themselves, a botched electrical wiring job resulted. Ultimately, HMK had no choice but to call in a professional to fix it. In fact, Mr. Barahona's house was in such bad condition that the Defendant told him that it would probably fail a city inspection and be knocked down. It was ultimately bulldozed in April 2018.

11.     In 2016, the city of Dallas passed new minimum housing standards for single-family rental properties. HMK's rental properties in predominantly minority neighborhoods, including the houses of Mr. Campos and Mr. Barahona, did not meet these standards. Instead of updating its properties to be habitable and comply with the new code, the Defendant decided to evict its tenants and sell the properties. The Defendant served the Plaintiffs, along with over 300 other families, with notices to vacate. Mr. Campos and Mr. Barahona felt lost and dejected at the prospect of losing their homes and having nowhere else to go. Having been loyal tenants of HMK for many years, they didn't believe they deserved to be kicked out of their homes.

12.     The Defendant was not able to immediately follow through on its mass eviction plan. Pursuant to a lawsuit for various local and state property code violations, a local court ordered a temporary stay prohibiting HMK from evicting any of its tenants for any reason other than non-payment of rent. In return, the city of Dallas agreed not to seek code enforcement or other civil penalties against any of HMK's properties.

13.     Stymied in its attempt to raise funds by selling off its renters' homes, the Defendant tried another tack. It decided to capitalize on the situation with a novel mortgage loan that would get HMK the best of both worlds – steady monthly payments without the need to make any repairs whatsoever to the dilapidated properties. This move would allow HMK to continue collecting money from its tenants while forcing the responsibility of badly needed home repairs on them. All the Defendant had to do was convince its tenants that they would become homeowners if they agreed to stop being renters.

14.     Mr. Campos and Mr. Barahona knew little about HMK's plans. What they did know was that their futures in their homes were uncertain and that they still had notices to vacate. So when the Defendant approached them with an offer to sign its lengthy mortgage loan agreements and own their own homes, they were relieved and felt it was the only choice they had besides getting evicted. HMK offered the Plaintiffs a single, 20-year, closed-end extension of credit of approximately $65,000, 5% APRs, and monthly payments. However, HMK also inserted a "snatch-back clause" into its contracts that would allow it to call the mortgage at any time and for no reason whatsoever for the entire life of the loan. It states:

> This note is callable at the option of Lender from the date hereof until Maturity. It is payable in full upon the earlier of 1) when called by Lender, if called by Lender, or 2) at Maturity. Borrower must repay the entire principal balance of this Note when due, any unpaid interest owed, and any other sums Borrower owes Lender pursuant to the terms of the lien securing this Note. Lender is under no obligation to refinance this loan at that time.

Even though the Defendant promised Mr. Campos and Mr. Barahona homeownership, it was really putting them in a position no more secure than renting, and with the added burden of having to pay for repairs themselves.

15.     HMK's mortgage loans also include contradictory and confusing provisions regarding the interest rate for the mortgage. The first page of the "closing disclosures" that were a part of the Plaintiffs' loan documents indicates that the interest rate is under 5% and that this amount cannot increase after closing. However, later on, the contract then indicates that "if Borrower is in default as described later in this Note, interest will accrue at the 'Maximum Rate,' which is the maximum interest rate pursuant to state or federal law, or 18%, whichever is higher." Thus, the interest rate can increase after closing. In addition, the APRs are incorrect in both of the Plaintiffs' "closing disclosures" that they received on the day they consummated their loan transactions.

16.     The 18% interest rate is triggered whenever HMK deems a default has occurred. Problematically, however, "default" was not clearly defined nor explained, nor was the 18% interest rate figured into the Plaintiffs' regular monthly payments.

17.     The failure to define "default" is more troubling because HMK's contracts have no grace period for a late payment – meaning that the Plaintiffs may be considered in default even if any payment were even one day late. This also contradicted what the Plaintiffs were told about the grace period at the time they signed the loan documents.

18.     In addition to the confusing terms of their mortgage contracts, HMK also violated the TILA and the Texas Property Code in failing to provide Plaintiffs with a copy of the required disclosures of any of the contractual provisions. Specifically, HMK failed to provide advance disclosures by delivery or mail regarding the amount financed, the amount

of the finance charge, the annual percentage rate, the "total of payments," and the number, amount, and due dates or period of payments scheduled to repay the "total of payments." Moreover, HMK also failed to provide Plaintiffs with a statutory notice that they were under no obligation to sign the agreement, which should have accompanied these disclosures. Consumers must receive the above information within three days of submitting their loan application, and at least seven days before the consummation of a credit transaction can take place. HMK failed to request a loan application for Mr. Campos prior to the loan signing and didn't have Mr. Barahona sign one until months later, which HMK then backdated to make it appear as if it were signed with the loan transaction.

19.    Although Mr. Campos had a brief meeting with HMK's agents approximately ten days before signing his loan and was asked to sign some documents then, he was provided with very little explanation as to what the documents were and did not receive a copy of any documents in a form he could keep. Having the documents and disclosures ahead of time would have been very helpful to Mr. Campos so he could have sought translation of the documents and advice regarding the terms. However, because the Defendant did not make it possible for him to receive a copy of any of the documents ahead of time, Mr. Campos was denied access to meaningful disclosures. In fact, Mr. Campos has no idea what was written in these documents.

20.    At the initial meeting, HMK also told Mr. Campos to sign something waiving his right to pursue legal action against the Defendant. Such a waiver is prohibited by the law in a residential real estate transaction like this one and does not bar the legal claims of the Plaintiffs in this suit. However, the very fact that HMK thought ahead of time to require

the signing of such a waiver is an indication that it was aware that it was persuading people like Mr. Campos and Mr. Barahona to sign documents that were less than legal.

21.     Even though both Plaintiffs – like the others offered these loans – are low-income, HMK failed to offer loan counseling to them prior to having them sign the contracts. The Defendant did not run a credit check or provide them with a disclosure of their credit score, and failed to use a fee collected in advance of closing of the residential mortgage loan for a purpose for which the fee was paid. HMK acted in the dual capacity of a residential mortgage loan company and real estate broker. The contract terms also indicate HMK would charge the Plaintiffs a 5% late fee if any payment were more than 15 days late, the inclusion of which was intentional in the context of Plaintiffs' high-cost mortgages.

22.     Having rented to the Plaintiffs for years, HMK was well aware that the Plaintiffs are Spanish-speakers who understand very little English. HMK thus knowingly and intentionally took advantage of their lack of experience and capacity by foisting lengthy, wordy contracts in English on them minutes before they were to be signed, without a copy of the disclosures required in the days and weeks leading up to the signing. On the day of the loan signing, HMK gave Mr. Campos loan documents that totaled 88 pages and Mr. Barahona, 91 pages, in a language they could not read and with only a selective explanation of their terms.

23.     Even though the many loan documents with which Mr. Campos was provided at HMK's office on June 1, 2017 were lengthy and detailed, he had no real chance to review them before signing that day. The focus of the meeting was more about HMK's perceived goodwill in allowing Mr. Campos to stay in his home and his own excitement about being a first-time homeowner than it was a fair explanation of all the relevant terms and

provisions in the documents. HMK invited a representative from the media into the room for the closing who asked Mr. Campos questions about how he felt about becoming a homeowner at the same time as he was talking to HMK's agents about the documents.

24.     As Defendant and its agents knew, Mr. Campos cannot read English. As he explained to Defendant's agents at the signing, he grew up without a basic education or schooling, so there was no way he could possibly read or understand the numerous complex documents he was told to sign in less than a half hour. Even if Mr. Campos had viewed some of the same disclosures in the earlier meeting with HMK that were ultimately a part of the loan documents he signed on June 1, 2017, because of his limited ability to understand English, he wouldn't have had any meaningful access to these provisions as required under the TILA because a copy was never delivered to him.

25.     While HMK failed to provide a translation of the 88 documents it asked Mr. Campos to read and sign, it did employ a notary who spoke Spanish to serve as its agent for the signing of the documents. However, Defendant's notary did not explain the details of the documents that were unfavorable to Mr. Campos, and key provisions were omitted entirely. For example, HMK had him sign documents that included a statement that he had received the many disclosures required under the TILA ahead of time. In fact, he had not received a copy of the disclosures in a form he could keep. As the Defendant knew, he could not read this statement himself without help while sitting there, and HMK's agent did not translate it for him before notarizing his signature on it.

26.     At the time, Mr. Campos was delighted because he thought he was getting a comprehensive explanation of the documents he was signing, but what he really received was a glossy summary.  It is no wonder that when he was asked if he was being threatened

by HMK to sign the documents, he responded to the contrary. With the only other option being eviction, and without a full explanation as to all of the terms in the contract, Mr. Campos was under the impression that he was getting a good deal.

27.     Mr. Campos really wanted to become a homeowner. He was an American citizen, and he felt this was the last step in realizing the American dream. Sadly, however, there were many terms that HMK did not explain to Mr. Campos prior to signing, including the 18% interest rate upon undefined default, that HMK could call the loan at any time, and that Mr. Campos was being asked to waive his right to an inspection prior to closing.

28.     At a press conference to which HMK shuttled Mr. Campos immediately after signing the contract, the Defendant touted the legitimacy, legality, and transparency of the mortgage deal, while failing to include any mention of the problematic provisions. These omissions were purposeful and calculated, as were their inclusion in the Plaintiffs' contracts. Based on HMK's representations, Mr. Campos believed the Defendant would be an affordable housing advocate for him and the other 17 people who were expected to also become new homeowners that day, and would thus help them secure repairs for their homes. HMK also gave Mr. Campos the impression that all of its mortgage documents were legitimate with nothing other than traditional language in them, citing its past lending experience in South Oak Cliff, a neighborhood in Dallas, where 58 other homes had been sold on similar terms.

29.     The October 12, 2017 meeting during which Mr. Barahona signed his contract was also very brief considering the length of the loan package and their presentation in a language foreign to Mr. Barahona. Mr. Barahona signed 91 pages of loan documents for a different home than the one he had rented, since his former home would be leveled. This

home, like the last, was in very poor condition – appraised at only $12,000 and deemed "undesirable" per the Dallas Central Appraisal District's assessment, although in the meeting HMK indicated the value was closer to $65,000. HMK's notary and another agent were also present during this meeting, but in the same manner as with Mr. Campos, only briefly and selectively summarized the documents Mr. Barahona was asked to sign. When he asked if could contact her later if he had other questions about the mortgage, HMK's notary refused his request.

30.     Like Mr. Campos, Mr. Barahona could not read the documents, and the Defendant did not give him a chance to review the documents it told him to sign ahead of time. Mr. Barahona was not provided with any documents that had been translated to his native Spanish. HMK's agent also threatened Mr. Barahona not to support any accusations he heard about their practices and asked him to sign something waiving his right to pursue legal action against HMK. Mr. Barahona believed that he and his family would be homeless if he didn't sign each and every document that was in front of him, even if he didn't understand what he was signing. He also did not know that the waiver he was asked to sign was prohibited by law. While Mr. Barahona also signed something that day acknowledging he had also received a copy of the TILA disclosures ahead of time, in reality none of these documents were provided to him ahead of time in the manner required by the TILA.

31.     As with Mr. Campos, there were many terms in the contract about which Mr. Barahona was unaware because the Defendant did not tell him about them. While he understood the monthly payment amount and when his payments were due, he was completely unaware of the 18% interest rate upon default, the snatch-back clause, and that

he had unknowingly waived his right to an inspection prior to closing. Upon information and belief, HMK paid John Carney to write loan documents that included these terms.

32.     Although at the time of the signing, the Plaintiffs expressed satisfaction with the sale, their excitement quickly turned to disappointment and fear when they discovered that HMK could take their homes at any time and that they would be on the hook for a steep interest rate upon default.

33.     HMK pressed these predatory contracts almost entirely on people of color, and largely those who were Hispanic and born in a different country, like the Plaintiffs. The only neighborhoods in which the Defendant tried to get people to take on these loan terms are those whose residents are predominantly people of color. Upon information and belief, HMK caused more than a hundred other people of color in nearby majority-minority neighborhoods to sign similar illegal loan agreements without ensuring they properly received disclosures required by the law. Over the last year, the Defendant has regularly been extending credit to many of its former tenants with similar loan agreements to pay for their homes.

34.     HMK's agents reassured Mr. Campos during the loan signing that his loan terms were the same as those notarized for multimillion dollar homes in the Dallas area, which are located in majority-white neighborhoods. However, the reality is that HMK does not actually offer loans on these terms in majority-white communities in Dallas.

35.     Mr. Campos and Mr. Barahona are Hispanics who were born in different countries, have little education or English-speaking ability, and live in mostly nonwhite neighborhoods. The Defendant focused on these neighborhoods in part because the people who live in these communities would be more likely to sign disadvantageous loan terms

without objection or disclosures. HMK is reverse redlining the Plaintiffs and their neighborhoods and securing unfair loan terms by illegally failing to deliver required disclosures and offering loans that are not designed to offer true homeownership.

CAUSES OF ACTION

I. Violations of the TILA

36.     Defendant violated the Truth in Lending Act by failing to properly provide the Plaintiffs with a copy of adequate advance disclosures and other accurate information regarding their loan terms.

37.     The TILA applies to HMK because it is a creditor that "(1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement." 15 U.S.C.A. § 1602.

38.     The TILA requires creditors like HMK to provide certain advance disclosures to consumers, which vary depending on whether the transaction is "open-end" or "closed-end". Because the mortgage contracts into which the Plaintiffs entered with the Defendant here involve a single extension of credit that provides for monthly installments of a specified amount, they are closed-end transactions. *See* 12 C.F.R. §§ 226.2(a)(10) and 226.2(a)(20).

39.     In closed-end credit transactions, the TILA requires creditors to make certain initial disclosures before the credit is extended. 15 U.S.C.A. 1638(b)(1). These disclosures

include the amount financed; the finance charge expressed as an annual percentage rate; the "total of payments," and the number, amount, and due dates or period of payments scheduled to repay the "total of payments;" and, where the credit is secured, a statement regarding any security interest has been taken in property. 15 U.S.C.A. § 1638(a). These disclosures must be made clearly and conspicuously. 15 U.S.C.A. § 1632(a).

40.     For mortgage contracts subject to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §2601 *et. seq.*, and that are secured by the consumer's dwelling such as those at issue in this case, the TILA provides for specific timelines for when consumers must receive these disclosures. 15 U.S.C.A. § 1638(b)(2)(A). Creditors are required to provide good faith estimates of the above disclosures to consumers by delivery or mail not later than the third business day after the creditor receives the consumer's written application, which must be at least seven business days before the consummation of the transaction. *Id.* In the case of an extension of credit that is secured by the dwelling of the consumer, creditors are also required to provide the following language to the consumer as a final disclosure at the time of consummation of the transaction and in conspicuous size and format: "You are not required to complete this agreement merely because you have received these disclosures or signed a loan application." 15 U.S.C.A. § 1638(b)(2)(B). Finally, the initial advance disclosures must be provided to the consumer in a form they can keep. 12 C.F.R. § 1026.17(a)(1).

41.     HMK failed to mail or deliver any of the above disclosures to the Plaintiffs in advance of the consummation of the transaction, and did not provide the Plaintiffs with any disclosure about not being required to complete the agreement HMK was offering them or

have them sign loan applications before closing. While Mr. Barahona was asked to sign a loan application, this was not until months after the loan transaction was complete.

<u>II. Violations of the ECOA and the Federal and Texas FHA</u>

42.     Defendant violated the Equal Credit Opportunity Act and the federal and Texas Fair Housing Acts because it discriminated against them in the context of credit and residential real-estate transactions on the basis of their membership in a protected class.

43.     Under the FHA, any person or entity whose business includes engaging in residential real-estate transactions shall not discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, or national origin. 42 U.S.C. § 3605. It is also a violation of the Texas FHA to discriminate against another in the terms, conditions, or privileges of sale or rental of a dwelling or in providing services of facilities in connection with a sale or rental of a dwelling because of race, color, or national origin. TEX. PROP. CODE ANN. § 301.021. The Plaintiffs are members of all three of these protected classes.

44.     HMK is a creditor under the ECOA because it "regularly extends, renews, or continues credit." 15 U.S.C.A. § 1691a. Under the FHA, it is an entity whose business includes engaging in residential real estate transactions, which is defined as the "making or purchasing of loans or providing other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling; or secured by residential real estate…" or "the selling, brokering, or appraising of residential real property." 42 U.S.C. § 3605(b).

45.     Under the ECOA, discrimination includes engaging in predatory lending by targeting neighborhoods comprised primarily of minorities and imposing predatory credit terms on them. 15 U.S.C.A. § 1691. Under the FHA, discrimination includes targeting a

member of a protected class for a loan with less favorable terms than would have been extended to people outside the particular class as well as facially neutral practices or policies which have a disproportionately adverse impact on members of a protected class. The Defendant intentionally targeted the Plaintiffs and the predominantly nonwhite neighborhoods in which they live on the basis of race, color, and national origin with grossly unfavorable loans, including a due on demand provision, ambiguous default provisions involving an increase in the interest rate to 18%, and placing the onus on them to make all necessary repairs to homes that were in poor condition at the time of signing. In addition, regardless of HMK's intentions, its practices disproportionately impact communities and people of color like Mr. Campos and Mr. Barahona.

RELIEF REQUESTED

Declaratory Relief

46.     Plaintiffs are entitled to a declaratory judgment stating Defendant's violations of the law, specifying that the Plaintiffs are entitled to and were denied the consumer protections under TILA and that the Defendant violated the FHA and the ECOA.

Injunctive Relief

47.     The Plaintiffs will continue to experience unlawful discrimination as a result of Defendant's refusal to comply with the federal and Texas FHA and the ECOA, for which there is no adequate remedy at law, and endure the ongoing injury of their predatory mortgage contracts under TILA. Thus, injunctive relief is necessary so that the Plaintiffs and other individuals whom HMK induced to sign similar mortgage contracts can enjoy the protections to which they are entitled under the law and so that Defendant modifies its illegal contracts, loans, and other lending practices to accord with the law.

## Damages

48.     Each Plaintiff is entitled to actual and statutory damages under the TILA, as well

as actual and punitive damages under the ECOA and the federal and Texas FHA.

## Attorneys' Fees and Costs

49.     The Plaintiffs are entitled to reasonable attorneys' fees, litigation expenses, and

court costs under all of their causes of action.

## JURY REQUEST

50.     Plaintiffs respectfully demand a jury trial pursuant to Fed. R. Civ. P. 38(a) and (b).

## PRAYER FOR RELIEF

Therefore, Plaintiffs respectfully request that this Court order the following relief:

A. Issue a permanent injunction requiring HMK, its agents, servants, and employees, and all persons acting in concert with Defendant, to eliminate all barriers described herein that prevent the Plaintiffs from having access to their protections under the law and to take all steps within its power to make the Plaintiffs whole;

B. Declare that Defendant's failure to abide by consumer protection and fair housing laws described herein resulted in the violation of the Plaintiffs' rights to fair housing and to be free from discrimination;

C. Award each Plaintiff statutory, actual, and punitive damages they are entitled for each violation of the law by the Defendant;

D. Find that the Plaintiffs are the prevailing party in this action, and order Defendant liable for their attorneys' fees, costs, and litigation expenses; and

E. Grant any other relief to which Plaintiffs may be entitled and which the Court believes is in the interest of justice.

Dated: May 30, 2018

Respectfully submitted,

  /s/ John M. Hasley
John M. Hasley
Texas State Bar No. 24056951
Stephanie Champion
Texas State Bar No. 24105586

Legal Aid of Northwest Texas
600 E. Weatherford Street
Fort Worth, Texas 76102
(817) 339-5315 (phone)
(817) 649-4759 (fax)

Ann Maldonado Heaps
Texas State Bar No. 24107434
Wayne Krause Yang
Texas State Bar No. 24032644

Texas Legal Services Center
2101 S. IH 35 Frontage Road
Suite 300
Austin, Texas 78741
(512) 477-6000 (phone)
(512) 477-6576 (fax)

ATTORNEYS FOR PLAINTIFFS